UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
VIANNLY FONDEUR,

                              Plaintiff,

                    -v-

The CITY OF NEW YORK, NEW YORK CITY
POLICE DEPARTMENT, P.O. RICHARD
NATAL and P.O. JOHN DOE individually
and in his official capacity, (the name John Doe
being fictitious, as the true names are presently
unknown)

                              Defendants.
-------------------------------------------------------------x

Index No.:

**COMPLAINT AND
DEMAND FOR JURY
TRIAL**

## PRELIMINARY STATEMENT

1.      This is a civil rights action brought to vindicate the Plaintiff's rights under

the First, Fourth, Fifth and Fourteenth Amendments of the Constitution of the United

States, and under the Civil Rights Act, 42 U.S.C. § 1983.

2.      Plaintiff VIANNLY FONDEUR's ("FONDEUR) rights were violated

when officers of the NEW YORK CITY POLICE DEPARTMENT ("NYPD") and

employees of the CITY OF NEW YORK ("CITY") unconstitutionally and without any

legal basis seized, assaulted, battered, detained, arrested and initiated prosecution against

Plaintiff FONDEUR.  By reason of each of the Defendants' actions, including their

unreasonable and unlawful conduct and protracted detention, Plaintiff FONDEUR was

deprived of her constitutional rights.

3.      Plaintiff FONDEUR also seeks an award of compensatory and punitive

damages and attorneys' fees.

## JURISDICTION AND VENUE

4.     This Court has subject matter jurisdiction over federal claims pursuant to 28 U.S.C. §§ 1331, 1343 (3) and (4). This action is brought pursuant to 42 U.S.C. §§1983 and 1988 and the First, Fourth, Fifth and Fourteenth Amendments of the Constitution of the United States.

5.     This Court has supplemental jurisdiction over Plaintiff's claims against Defendants under the Constitution and the laws of the State of New York because they are so related to the within federal claims that they form part of the same case or controversy pursuant to 28 U.S.C. §1367(a).

6.     Venue is proper pursuant to 28 U.S.C. §1391(b) in that Plaintiff's claim arose in the Southern District of New York.

7.     An award of costs and attorneys' fees is authorized pursuant to 42 U.S.C. §1988.

## JURY DEMAND

8.     Plaintiff respectfully demands a trial by jury of all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

## PARTIES

9.     At all times pertinent to this complaint, Plaintiff FONDEUR is and was a resident of the City of Yonkers, County of Westchester, in New York State.

10.     Defendant CITY, is and was at all times relevant to this action a municipal entity created and authorized under the laws of the State of New York. It is authorized by law to maintain a police department which acts as its agent in the area of law enforcement and for which it is ultimately responsible. The Defendant CITY assumes the risks

incidental to the maintenance of a police force and the employment of police officers as said risks attach to the public consumers of the services provided by the NYPD.

11.    Defendants NYPD POLICE OFFICER ("P.O.") RICHARD NATAL and P.O. JOHN DOE (collectively the "Defendants") are and were at all times relevant herein, officers, employees and agents of the NYPD. Each of the Defendants is being sued herein in their individual and official capacities for monetary damages.

12.    At all times relevant herein, the Defendants were acting under color of state law in the course and scope of their duties and functions as agents, servants, employees and officers of NYPD, and otherwise performed and engaged in conduct incidental to the performance of their lawful functions in the course of their duties. They were acting for and on behalf of the NYPD at all times relevant herein, with the power and authority vested in them as officers, agents and employees of the NYPD and incidental to the lawful pursuit of their duties as officers, employees and agents of the NYPD.

13.    The Defendants' acts hereafter complained of were carried out intentionally, recklessly, with malice and gross disregard for Plaintiff's rights.

## STATEMENT OF FACTS

14.    The events described herein occurred principally in New York County the evening of December 30, 2011.

15.    On that date, at approximately 8:10 P.M., Plaintiff FONDEUR had double-parked her car in front of Empanadas Monumental, a restaurant located at 522 West 207th St., New York, NY.

16.    After parking her car, Plaintiff FONDEUR then went inside the restaurant to place an order for take out.

17.    In the parked vehicle remained her friend, Dianna Mendosa (Ms. Mendosa) who sat at the front passenger's seat and Plaintiff's two-year old daughter who sat in a car seat in the rear.

18.    Soon after placing her order at the restaurant, Plaintiff FONDEUR looked outside towards where her vehicle was parked and noticed that a marked police vehicle had pulled up behind her car.

19.    In the police vehicle were Defendant NATAL, who was sitting at the driver's seat, and Defendant DOE, who was sitting in the front passenger seat.

20.    Upon noticing the police vehicle behind her car, Plaintiff FONDEUR exited the restaurant and headed towards her car.

21.    Plaintiff FONDEUR then entered her vehicle on the driver's side and asked her friend Ms. Mendosa why she had not moved the car. Ms. Mendosa responded by telling Plaintiff FONDEUR that she was going to move the vehicle after fastening her daughter's seatbelt. After hearing this, Plaintiff FONDEUR then exited the car and headed towards the restaurant to see if her order was ready.

22.    While Plaintiff FONDEUR walked towards the restaurant, the Defendants sounded the sirens of the patrol vehicle. As soon as Plaintiff FONDEUR heard the sirens, she turned around and walked to the police vehicle. When she reached the police vehicle, Defendant DOE told her to move her car. Plaintiff FONDEUR told Defendant DOE that her friend Ms. Mendosa was going to move the vehicle. Defendant NATAL, in an angry and upset tone then told Plaintiff FONDEUR to move the car to which she again

replied that her friend was going to move the car. At that point, she turned around and reentered the restaurant.

23.    Soon after Plaintiff FONDEUR entered the restaurant, she received a call from Ms. Mendosa in which she informed her that Defendant NATAL was headed towards the restaurant. When Defendant NATAL entered the restaurant, he reminded Plaintiff FONDEUR in a loud and agitated voice that he had told her to move the vehicle. Plaintiff FONDEUR told Defendant NATAL that her friend Ms. Martinez was going to move the car.

24.    At that point, upon information and belief, Defendant NATAL, visibly angry and irritated, threatened to arrest Plaintiff FONDEUR.

25.    After Plaintiff FONDEUR told Defendant NATAL that she had not done anything wrong, without notice or justification, Defendant NATAL forcibly grabbed Plaintiff by the arms, pushed her into the hot food drop-in wells, placed her in a chokehold with one arm and started repeatedly punching her about the face and head with the other. Plaintiff FONDEUR tried to stop the onslaught by pushing Defendant NATAL away from her, but with the Defendant being much bigger and stronger than her, she was unsuccessful. The assault only ended when Defendant DOE entered the restaurant and pulled Defendant NATAL off Plaintiff FONDEUR. By that point, Plaintiff FONDEUR was seriously bruised about her face, arms, and shoulders, and bleeding from her forehead.

26.    Plaintiff FONDEUR was then handcuffed and arrested.

27.    The Defendants then transported Plaintiff FONDEUR in an NYPD squad car to the Thirty-Fourth Precinct approximately twenty minutes after the start of the incident.  Plaintiff FONDEUR was never informed of her charges.

28.    At approximately 10:30 P.M., the Defendants transported Plaintiff FONDEUR to Central Booking.

29.    The detention of Plaintiff FONDEUR caused her to be needlessly separated from her children for a period close to Twenty-Four hours.

30.    Plaintiff FONDEUR was charged with Resisting Arrest under N.Y.P.L. § 205.30, Attempted Assault in the Third Degree under N.Y.P.L. § 110/120.00(1), and Disorderly Conduct under N.Y.P.L. § 240.20.

31.    When Plaintiff FONDEUR returned to New York County Criminal Court on March 2, 2012, the New York District Attorney's Office informed the Court that the People could not prove the charges beyond a reasonable doubt and withdrew all the charges against Plaintiff FONDEUR.

32.    As a result of this incident, Plaintiff FONDEUR has suffered the trauma, debasement, humiliation and fright of being publicly assaulted, arrested, detained, and unlawfully imprisoned without cause. Additionally, Plaintiff FONDEUR experienced mental and psychological pain as a result of being unlawfully arrested and tried for a crimes she did not commit.

33.    Prior to the institution of this action and within ninety days from the date when the cause of action accrued herein, on March 7, 2012, Plaintiff served a Notice of Claim upon the comptroller of Defendant CITY.

34.    That a 50-h hearing was held by Defendant CITY on September 21, 2012.

35.    That this action was not commenced until the expiration of thirty (30) days after such notice of claim and intention to sue was presented and Defendant CITY has neglected and/or refused to make adjustments or payments thereon.

36.    That this action is being commenced within one (1) year and ninety (90) days after the causes of action accrued herein.

## FIRST CAUSE OF ACTION
## DEPRIVATION OF RIGHTS UNDER THE UNITED STATES CONSTITUTION AND 42 U.S.C. § 1983

37.    Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

38.    The Defendants, under color of state law, subjected Plaintiff to the foregoing acts and omissions without due process of law and in violation of 42 U.S.C. § 1983 thereby depriving Plaintiff of her rights, privileges and immunities secured by the First, Fourth, Fifth and Fourteenth Amendments to the United States Constitution, including, without limitation, deprivation of the following constitutional rights:

A. Freedom to engage in protected speech, expression and association;

B. Freedom from unreasonable seizure of her person;

C. Freedom from arrest without probable cause;

D. Freedom from false imprisonment, meaning wrongful detention without good faith, reasonable suspicion or legal justification, and of which plaintiff was aware and did not consent;

E. Freedom from the lodging of false charges against her by the police;

F. Freedom from abuse of process;

G. Freedom from deprivation of liberty without due process of law; and

H. Equal protection, privileges and immunities under the laws.

39.    The Defendants' deprivation of Plaintiff's constitutional rights resulted in the injuries and damages set forth above.

### SECOND CAUSE OF ACTION
### FAILURE TO INTERVENE UNDER THE FOURTH AMENDMENT
### AND 42 U.S.C. § 1983

40.    Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

41.    Members of the NYPD have an affirmative duty to assess the constitutionality of interactions between their fellow members of service and civilians and to intervene where they observe another member of the Police Department or other law enforcement agency employing unjustified and excessive force against a civilian or falsely arresting a civilian.

42.    Defendant DOE was present on the evening of December 30, 2011, and witnessed Defendant NATAL unlawfully arrest the plaintiff.

43.    The Defendants' use of force against Plaintiff was excessive and unjustified under the circumstances, yet Defendant DOE failed to take any action or make any effort to intervene, halt or protect plaintiff from being subjected to excessive force by Defendant NATAL until it was too late.

44.    The arrest of Plaintiff and the initiation of criminal charges against her was clearly without probable cause or other legal justification, and was based on fabricated facts alleged by Defendant NATAL. Defendant DOE failed to take any action or make any effort to intervene, halt or protect Plaintiff from being unlawfully and wrongfully arrested and prosecuted.

45.     The Defendants' violations of Plaintiff's constitutional rights by failing to intervene in the other Defendants' clearly unconstitutional use of force and Plaintiff's unconstitutional arrest resulted in the injuries and damages set forth above.

### THIRD CAUSE OF ACTION
### RESPONDEAT SUPERIOR LIABILITY OF THE CITY OF NEW YORK FOR STATE LAW VIOLATIONS

46.     Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

47.     The conduct of each and all of the Defendants alleged herein, occurred while they were on duty and in uniform, and/or in and during the course and scope of their duties and functions as New York City Police Officers, and/or while they were acting as agents and employees of Defendant CITY, clothed with and/or invoking state power and/or authority, and, as a result, Defendant CITY is liable to Plaintiff pursuant to the state common law doctrine of *respondeat superior*.

48.     As a result of the foregoing, Plaintiff was deprived of her liberty, endured pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

### FOURTH CLAIM
### FALSE ARREST AND FALSE IMPRISONMENT

49.     Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

50.     By the actions described above, the Defendants caused to be falsely arrested or falsely arrested Plaintiff, without reasonable or probable cause, illegally and without a warrant, and without any right or authority to do so.  The acts and conduct of the Defendants were the direct and proximate cause of injury and damage to Plaintiff and

violated her statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

51.    As a result of the foregoing, Plaintiff was deprived of her liberty, endured pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

### FIFTH CAUSE OF ACTION
### ABUSE OF PROCESS

52.    Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

53.    By the conduct and actions described above, the Defendants employed a regularly issued process against Plaintiff compelling the performance or forbearance of prescribed acts.  The purpose of activating the process was intent to harm Plaintiff without economic or social excuse or justification, and the Defendants were seeking a collateral advantage or corresponding detriment to Plaintiff which was outside the legitimate ends of the process.  The acts and conduct of each of the Defendants were the direct and proximate cause of injury and damage to Plaintiff and violated her statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

54.    As a result of the foregoing, Plaintiff was deprived of her liberty, endured pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

## SIXTH CAUSE OF ACTION
## VIOLATION OF RIGHT TO EQUAL PROTECTION OF LAW

55.      Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

56.      By the actions described above, Defendants violated Plaintiff's right to equal protection of law.  The acts and conduct of the Defendants were the direct and proximate cause of injury and damage to Plaintiff and violated her statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

57.      As a result of the foregoing, Plaintiff was deprived of her liberty, endured pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

## SEVENTH CAUSE OF ACTION
## NEGLIGENCE

58.      Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

59.      Each of the Defendants, jointly and severally, negligently caused injuries, emotional distress and damage to Plaintiff.  The acts and conduct of the Defendants were the direct and proximate cause of injury and damage to Plaintiff and violated her statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

60.      As a result of the foregoing, Plaintiff was deprived of her liberty, endured pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

## EIGTH CAUSE OF ACTION
## NEGLIGENT HIRING, SCREENING, SUPERVISION AND TRAINING

61.    Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

62.    Defendant CITY OF NEW YORK negligently hired, screened, retained, supervised, and trained the Defendants. The acts and conduct of the Defendants were the direct and proximate cause of injury and damage to Plaintiff and violated his statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

63.    As a result of the foregoing, Plaintiff was deprived of her liberty, endured pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

## NINTH CAUSE OF ACTION
## (MONELL CLAIM AGAINST DEFENDANT CITY- 42 U.S.C. § 1983)

64.    Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

65.    All of the acts and omissions by the named and unnamed Defendants described above were carried out pursuant to overlapping policies and practices of the CITY OF NEW YORK which were in existence at the time of the conduct alleged herein and were engaged in with the full knowledge, consent, and cooperation and under the supervisory authority of the Defendant CITY and its agency, the NYPD.

66.    The acts complained of were carried out by the aforementioned Defendants in their capacities as police officers and officials pursuant to customs, policies, usages, practices, procedures and rules of the CITY and the NYPD, all under the supervision of ranking officers of the NYPD.

67.    Defendant CITY and the NYPD, by their policy-making agents, servants and employees, authorized, sanctioned and/or ratified the Defendants' wrongful acts; and/or failed to prevent or stop those acts; and/or allowed or encouraged those acts to continue.

68.    The actions of the Defendants resulted from and were taken pursuant to the following *de facto* policies and/or well-settled and widespread customs and practices of the Defendant CITY, which are implemented by members of the police department and include engaging in systemic and ubiquitous perjury, both oral and written, to cover-up constitutional and state law violations committed against civilians by either themselves or their fellow officers, supervisors and/or subordinates.  They do so with the knowledge and approval of their supervisors, commanders and Police Commissioner Raymond Kelly who all: (i) tacitly accept and encourage a code of silence wherein police officers refuse to report other officers' misconduct or tell false and/or incomplete stories, *inter alia*, in sworn testimony, official reports, in statements to the Civilian Complaint Review Board ("CCRB") and the Internal Affairs Bureau ("IAB"), and in public statements designed to cover for and/or falsely exonerate accused police officers; and (ii) encourage and, in the absence of video evidence blatantly exposing the officers' perjury, fail to discipline officers for "testilying" and/or fabricating false evidence to initiate and continue the malicious prosecution of civilians in order to cover-up civil rights violations perpetrated by themselves or fellow officers, supervisors and/or subordinates against those civilians.

69.    The aforementioned customs, practices, procedures and rules of the CITY and the NYPD include, but are not limited to, the following unconstitutional practices:

a.    Arresting persons known to be innocent in order to meet "productivity goals" (i.e., arrest quotas);

b.    Falsely swearing out criminal complaints, and/or lying and committing perjury during sworn testimony;

     i.    in order to protect other officers; and/or

     ii.   in order to meet said productivity goals

c.    Failing to supervise, train, instruct and discipline police officers and encouraging their misconduct;

d.    Discouraging police officers from reporting the corrupt or unlawful acts of other police officers;

e.    Retaliating against officers who report police misconduct; and

f.    Failing to intervene to prevent the above-mentioned practices when they reasonably could have been prevented by a supervisor or other agent or employee of the NYPD.

70.    The existence of aforesaid unconstitutional customs and policies may be inferred from repeated occurrences of similar wrongful conduct, as documented in the following civil rights actions filed against the CITY:

a.    *Lotorto v. City of New York*, 3771/2010 (Sup. Ct., Kings Co.) (police officers beat, arrest and destroy a video recording of a bystander who was recording an arrest occurring in public);

b.    *Taylor-Mickens v. City of New York*, 09 Civ. 7923 (RWS) (S.D.N.Y.) (police officers at the 24th Precinct issue four summonses to a woman in retaliation for her lodging a complaint with the Civilian Complaint Review Board at the precinct);

c.    *Callaghan v. City of New York*, 07 Civ. 9611 (PKC) (S.D.N.Y.) (officers accused of falsifying evidence and retaliatory arrests of bicyclists engaged in expressive conduct, to wit, riding in Critical Mass bicycle rides after the 2004

Republican National Convention);

d. *McMillan v. City of New York*, 04 Civ. 3990 (FB) (RML) (E.D.N.Y.) (officers fabricated evidence and used excessive force against an African-American man in Kings County and initiated drug charges against him, despite an absence of any quantum of suspicion);

e. *Long v. City of New York*, 09-CV-9216 (AKH) (S.D.N.Y.); *People v. Pogan*, 06416-2008 (Sup. Ct., N.Y. Co.) (officer who purposefully swore out a false complaint and used excessive force was convicted of falsifying police records and was prosecuted for recklessly using physical force; at the time of arrest the plaintiff was engage in expressive conduct in that he was riding in a Critical Mass bicycle ride, when he was assaulted by the officer);

f. *Lin v. City of New York*, 09-CV-1936 (PGG) (S.D.N.Y.) (Officers arrest person lawfully photographing an arrest of a bicyclist in Times Square and swear out a criminal complaint whose facts were contradicted by the evidence);

71.     The existence of the foregoing unlawful *de facto* policies and/or well-settled and widespread customs and practices is known by, encouraged and/or condoned by supervisory and policy-making officers and officials of the NYPD and the CITY, including, without limitation Commissioner Kelly.

72.     As stated in an order written by the Honorable District Court Judge Weinstein in the case of *Colon v.* City of New York, 09 Civ. 00008 (E.D.N.Y.) a case in which the Court denied the CITY's motion to dismiss on Iqbal/Twombly grounds, wherein the police officers at issue were fired and prosecuted for falsifying evidence in a purported buy-and-bust operation:

> "Informal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated, widespread falsification by arresting police officers of the New York City Police Department.
>
> Despite numerous inquiries by commissions and strong reported efforts by the present administration – through selection of candidates for the police force stressing academic and other qualifications, serious training to avoid constitutional violations, and strong disciplinary action within the department

– there is some evidence of an attitude among officers that is sufficiently widespread to constitute a custom or policy by the city approving illegal conduct of the kind now charged."

73.    Despite knowledge of such unlawful *de facto* policies, practices and/or customs, these supervisory and policy-making officers and officials of the NYPD and the CITY, including Commissioner Kelly, have not taken steps to terminate these policies, practices and/or customs, do not discipline individuals who engage in such polices, practices and/or customs, or otherwise properly train police officers with regard to the constitutional and statutory limits on the exercise of their authority, and instead sanction and ratify these policies, practices and/or customs through their active encouragement of, deliberate indifference to and/or reckless disregard of the effect of said policies, practices and/or customs upon the constitutional rights of persons in the City of New York.

74.    The aforementioned CITY policies, practices and/or customs of failing to supervise, train, instruct and discipline police officers and encouraging their misconduct are further evidenced, *inter alia*, by the following:

A. The Report of the Commission to Investigate Allegations of Police

Corruption and the Anti-Corruption Procedures of the Police Department

("Mollen Commission Report"), dated July 7, 1994, states:

In the face of this problem [of corruption], the [New York City Police] Department allowed its systems for fighting corruption virtually to collapse. It has become more concerned about the bad publicity that corruption disclosures generate than the devastating consequences of corruption itself. As a result, its corruption controls minimized, ignored and at times concealed corruption rather than root it out. Such an institutional reluctance to uncover corruption is not surprising. No institution wants its reputation tainted – especially a Department that needs the public's confidence and partnership to be effective. A weak and poorly resourced anti-corruption apparatus minimizes the likelihood of such taint, embarrassment and potential harm to careers. Thus

there is a strong institutional incentive to allow corruption efforts to fray and lose priority – which is exactly what this Commission uncovered. This reluctance manifested itself in every component of the Department's corruption controls from command accountability and supervision, to investigations, police culture, training and recruitment. For at least the past decade, the system designed to protect the Department from corruption minimized the likelihood of uncovering it. Mollen Commission Report, pp. 2-3.

B. The Mollen Commission concluded that police perjury and

falsification of official records is probably the most common form of

police corruption facing the criminal justice system:

". . . Regardless of the motives behind police falsifications, what is particularly troublesome about this practice is that it is widely tolerated by corrupt and honest officers alike, as well as their supervisors. Corrupt and honest officers told us that their supervisors knew or should have known about falsified versions of searches and arrests and never questioned them.

. . . What breeds this tolerance is a deep-rooted perception among many officers of all ranks within the Department that nothing is really wrong with compromising facts to fight crime in the real world. Simply put, despite the devastating consequences of police falsifications, there is a persistent belief among many officers that it is necessary and justified, even if unlawful. As one dedicated officer put it, police officers often view falsification as, to use his words, "doing God's work" – doing whatever it takes to get a suspected criminal off the streets. This attitude is so entrenched, especially in high-crime precincts, that when investigators confronted one recently arrested officer with evidence of perjury, he asked in disbelief, 'What's wrong with that? They're guilty.'"

Mollen Commission Report, pp. 36, 40-41.

D. Significant evidence of perjured sworn statements systemically

provided by officers to attempt to cover-up or justify unlawful mass

arrests of 1800 people has been and continues to be developed in the

consolidated litigation arising out of the 2004 Republican National

Convention. *See, e.g.,* Second Amended Class Action Complaint in

*MacNamara, et al. v. City of New York, et al.*, 04-CV-9216 (SDNY) at ¶¶

73(G) - (I), 102, 107, 112, 119, 124, 129, 143, 158, etc., 228, 232, 240,

259.

E. Former New York County District Attorney Robert Morgenthau has

been quoted as acknowledging that in the NYPD there is a "code of

silence," or a "code of protection" that exists among officers and that is

followed carefully.

F. In 1985, former Police Commissioner Benjamin Ward, testifying before

a State Senate Committee, acknowledged the existence of the "code of

silence" in the NYPD.

G. Former New York City Police Commissioner Robert Daly wrote in

1991 that the "blue wall of solidarity with its macho mores and prejudices,

its cover-ups and silence, is reinforced every day in every way."

H. Regarding Defendant CITY's tacit condonement and failure to

supervise, discipline or provide remedial training when officers engage in

excessive force, the Civilian Complaint Review Board ("CCRB") is a City

agency, allegedly independent from the NYPD, that is responsible for

investigating and issuing findings on complaints of police abuse of

civilians.  It is rare that the CCRB substantiates an allegation of police

misconduct.[1]  When it does, however, Police Commissioner Kelly controls

---

[1] In 2006, out of more than 10,000 allegations that were fully investigated, the CCRB substantiated only 594 (about 6%).  In 2007, out of more than 11,000 allegations that were fully investigated, the CCRB substantiated only 507 (about 5%).  *See* CCRB Jan-Dec. 2007 Status Report at p. 19, available at http://www.nyc.gov/html/ccrb/pdf/ccrbann2007_A.pdf.  Upon information and belief, the low rate of substantiated complaints is due in part to the above-noted *de facto* policy and/or well-settled and widespread custom and practice in the NYPD whereby police officers refuse to report other officers' misconduct or tell false and/or incomplete stories, *inter alia*, in sworn testimony and statements given to

whether the NYPD pursues the matter and he alone has authority to impose discipline on the subject officer(s). Since 2005, during Kelly's tenure, only one-quarter of officers whom the CCRB found engaged in misconduct received punishment more severe than verbal "instructions." Moreover, the number of CCRB-substantiated cases that the NYPD has simply dropped (*i.e.*, closed without action or discipline) spiked from less than 4% each year between 2002 and 2006, to 35% in 2007, and 30% in 2008. As a result, the percentage of cases where the CCRB found misconduct but where the subject officers were given only verbal instructions or the matter was simply dropped by the NYPD rose to 66% in 2007. Substantiated complaints of excessive force against civilians accounted for more than 10% of the cases that the NYPD dropped in 2007 and account for more than 25% of cases dropped in 2008. *See* 8/20/08 *Daily News* Editorial, "City leaders must get serious about policing the police."

75.     The aforementioned CITY policies, practices and/or customs of failing to supervise, train, instruct and discipline police officers and encouraging their misconduct are evidenced by the police misconduct detailed herein. Specifically, pursuant to the aforementioned CITY policies, practices and/or customs, the Defendants felt empowered to exercise unreasonable and wholly unprovoked force against Plaintiff, arrest Plaintiff without probable cause and then fabricate and swear to a false story to cover up this blatant violation of Plaintiff's constitutional and state law rights. Pursuant to the

the CCRB, to cover-up civil rights violations perpetrated by themselves or fellow officers, supervisors and/or subordinates.

aforementioned CITY policies, practices and/or customs, each of the Defendant officers failed to intervene in or report the other Defendants' violation of Plaintiff's rights or subsequent perjury.

76.     Defendant CITY and the NYPD, by their policy-making agents, servants and employees, authorized, sanctioned and/or ratified the Defendants' wrongful acts; and/or failed to prevent or stop those acts; and/or allowed or encouraged those acts to continue.

77.     Plaintiff's injuries were a direct and proximate result of the Defendant CITY and its agency, the NYPD's, wrongful *de facto* policies and/or well-settled and widespread customs and practices and of the knowing and repeated failure of the Defendant CITY and the NYPD to properly supervise, train and discipline their police officers.

78.     Defendant CITY knew or should have known that the acts alleged herein would deprive Plaintiff of his rights, in violation of the First, Fourth, Fifth and Fourteenth Amendments to the United States Constitution and Article 1, §§ 6, 8, 11, and 12 of the Constitution of the State of New York.

79.     Defendant CITY is directly liable and responsible for the acts of the Defendants because it repeatedly and knowingly failed to properly supervise, train, instruct, and discipline them and because it repeatedly and knowingly failed to enforce the rules and regulations of the NYPD, and to require compliance with the constitutions and laws of the State of New York and the United States.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff FONDEUR prays for relief as follows:

A. That she be compensated for violation of her constitutional rights, pain, suffering, mental anguish, and humiliation; and

B. That she be awarded punitive damages against the Defendants; and

C. That she be compensated for attorneys' fees and the costs and disbursements of this action; and

D. For such other further and different relief as to the Court may seem just and proper.

Dated:     New York, New York
           March 28, 2013

                                    Respectfully Submitted,

                         By:        /s/  _____

                                    Rhadames A. Ulloa
                                    Ulloa & Castillo, LLP
                                    *Attorneys for Plaintiff*
                                    305 Broadway – Suite 1400
                                    New York, NY 10007
                                    rhadamesulloa@gmail.com
                                    Office: 646-434-0049